**Daniel PAYNE, Plaintiff–Appellant,**

v.

**BOARD OF EDUCATION, CLEVELAND CITY SCHOOLS, Defendant–Appellee.**

**No. 94–6592.**

United States Court of Appeals, Sixth Circuit.

Argued Jan. 22, 1996.

Decided July 9, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 21, 1996.*

* Judge Ryan would grant rehearing for the reasons detailed in his dissenting opinion.

Tricia Dennis (argued and briefed), Farr, Dennis & Cordwell, Chattanooga, TN, for Plaintiff–Appellant.

John D. Kitch (argued and briefed), Kitch & Garman, Nashville, TN, for Defendant–Appellee.

Before: MARTIN and RYAN, Circuit Judges; KATZ, District Judge.**

MARTIN, J., delivered the opinion of the court, in which KATZ, District Judge, joined. RYAN, J. (pp. 400–04), delivered a separate dissenting opinion.

BOYCE F. MARTIN, Jr., Circuit Judge.

Daniel Payne appeals the district court's grant of summary judgment for the Cleveland City Schools Board of Education and the dismissal of his request for attorneys' fees under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400, *et seq.*

## I.

Payne is a minor with a history of serious emotional and behavioral problems who was enrolled in the Cleveland, Tennessee school system until April 1992, when a juvenile court ordered him to the Church of God for Children in Sevier County, Tennessee. After his discharge from that facility for disciplinary reasons, Payne was placed in the New Life Group Home in Chattanooga, Tennessee. Upon his release in December 1992, Payne sought to re-enroll in the Cleveland school system.

** The Honorable David A. Katz, United States District Judge for the Northern District of Ohio, sitting by designation.

On January 4, 1993, Cleveland City Schools requested permission from the juvenile court to evaluate Payne for special education purposes.[1] Permission was granted on January 5, and an evaluation was performed that day. Immediately afterwards, a letter was hand-delivered to Payne's mother stating that Payne was required to comply with school attendance laws, noting that Payne's April 1992 individualized educational program was still in effect, and offering a multidisciplinary team meeting to develop an appropriate individualized educational program for Payne. On January 7, a multidisciplinary team meeting was held and Payne's mother agreed to a temporary individualized educational program that provided for home schooling.

On January 12, a juvenile court hearing was held, during which the vice principal of Cleveland Junior High School recommended that Payne be placed in a wilderness camp. Upon that recommendation, the judge adjourned the hearing and instructed Payne's mother to obtain legal representation. On January 15, the interim individualized educational program was continued by agreement of the parties. One week later, the juvenile court held another hearing, where Payne's counsel asked the court to delay ruling on state-custody placement because counsel planned to request an administrative due process hearing with respect to Payne's educational needs. The court declined this request on the ground that Payne's placement by the court was collateral to the school system's educational obligations to Payne, although it indicated that more information regarding his psychiatric condition was necessary before it could rule on placement.

On January 22, the school system's Director of Special Education offered to hold another multidisciplinary team meeting. Two days later, a letter was sent to Payne's mother advising her that the school system had been pursuing educational placements for Payne, stating that such placements should be discussed during a multidisciplinary team meeting, indicating that formal notification of the meeting would follow, and offering the school system's cooperation in attempting to find solutions to the existing problems. On January 26, formal notification that a multidisciplinary team meeting would be held on February 4 was hand-delivered to Payne's mother. That same day, counsel for Payne mailed a request for a due process hearing to Cleveland City Schools. The request, which stated simply that its purpose was to determine whether the school system was providing Payne with a "free and appropriate education" as required by law, arrived January 28. In early February, the multidisciplinary team meeting and interim individualized educational program were continued by agreement of the parties.

On September 7, 1993, the multidisciplinary team meeting convened and developed a partial individualized educational program for Payne. On September 20, the Administrative Law Judge assigned to the due process hearing entered an order stating that Payne's request for a hearing would be dismissed if the parties failed to enter an order of compromise and settlement by September 28. That date passed, but on October 26, the multidisciplinary team developed a final individualized educational program for Payne that included provisions for educating him in a regular classroom setting with certain modifications, providing counseling, and permitting consultive services. Payne claims Cleveland City Schools made certain concessions in the final individualized educational program that it had not made earlier. On November 10, the Administrative Law Judge dismissed the due process hearing request without reaching the merits of Payne's claim.

On November 24, Payne filed a complaint pursuant to 20 U.S.C. § 1415(e)(4)(B), the attorneys' fees provision of the Individuals with Disabilities Education Act, against the Cleveland City Schools Board of Education seeking $27,000. In turn, the school system filed a motion for summary judgment, arguing that Payne did not qualify as a "prevailing party" under the statute, and therefore

---

1. The Cleveland City Schools Board of Education governs and administers the Cleveland school system, and is charged with overseeing and pro- tecting the procedural and substantive rights of handicapped children within the system.

failed to state a claim upon which relief could be granted. On November 3, 1994, the district court granted Cleveland City Schools' motion for summary judgment and dismissed Payne's claim for attorneys' fees. This timely appeal followed.

## II.

The Individuals with Disabilities Education Act guarantees "free appropriate public education" for disabled children. *See* 20 U.S.C. § 1415(a). The Act requires local education officials, teachers, and parents to develop a written individualized educational program for each disabled child detailing his or her level of performance, as well as goals and services to be provided by the school system. *Krichinsky v. Knox County Schools,* 963 F.2d 847, 849 (6th Cir.1992). A parent or guardian who feels the requirements of an individualized educational program, or any other statutory requirement, are not being met has "an opportunity for an impartial due process hearing which shall be conducted by the State educational agency ... as determined by State law or by the State educational agency." 20 U.S.C. § 1415(b)(2). An aggrieved party who is not satisfied with the results of the administrative proceedings may "bring a civil action with respect to the complaint ... in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(e)(2). Furthermore, "[i]n any action or proceeding brought under this subsection, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents or guardian of a child or youth with a disability who is the prevailing party." 20 U.S.C. § 1415(e)(4)(B).

This circuit has held that a parent or guardian who has "prevailed" at the administrative level and is seeking an award of attorneys' fees may file a separate suit in federal court for the limited purpose of recovering those fees. *Eggers v. Bullitt County School Dist.,* 854 F.2d 892, 894 (6th Cir.1988). Mindful of this fact and the rule that reported panel opinions are binding on subsequent panels of this court, *United States v. Gilliam,* 979 F.2d 436, 437 (6th Cir.1992), *cert. denied,* 507 U.S. 1034, 113 S.Ct. 1856, 123 L.Ed.2d

478 (1993), we express our concern as an initial matter that Congress may not have intended for this court to have jurisdiction over a claim for attorneys' fees filed by an individual who obtained no resolution on the merits of his or her claim at the administrative level. A commonsensical reading of the statutory language involved would appear to indicate that a party such as Payne, whose administrative claim is dismissed without a resolution on the merits, and who does not challenge or seek enforcement of an administrative decision in federal court, may not bring a separate cause of action in district court solely for the purpose of recovering attorneys' fees. The Individuals with Disabilities Education Act does not define the term "prevailing party," or effectively limit the instances in which an alleged "prevailing party" may bring a separate claim for attorneys' fees in federal court. We feel the statute is not clear on this issue, and express our frustration at the "semantic strain" involved in interpreting Section 1415(e)(4)(B) as encompassing legal services provided at the administrative level regardless of whether the merits of a claim were reached or a subsequent judicial proceeding was had. *See Brown v. Griggsville Com. Unit School Dist.,* 12 F.3d 681, 683 (7th Cir.1993) (discussing whether a district court has jurisdiction to entertain a suit under Section 1415(e) where no judicial hearing follows an administrative proceeding, and concluding that it does). Despite the lack of clarity on this issue, we accept that there is vested jurisdiction in this court to review Payne's claim for attorneys' fees, and will decide this appeal using the same basic procedures employed by the district court.

## III.

Before a plaintiff is eligible to recover attorneys' fees under the Individuals with Disabilities Education Act, he or she must have "prevailed" in an action or proceeding brought under the statute. A plaintiff must cross this " 'statutory threshold' of prevailing party status" before a district court may consider awarding attorneys' fees. *See Texas State Teachers Ass'n v. Garland Indep. School Dist.,* 489 U.S. 782, 789, 109

S.Ct. 1486, 1492, 103 L.Ed.2d 866 (1989) (discussing statutory threshold required to recover attorneys' fees under 42 U.S.C. § 1988).

■■■ This case is before us for a determination of whether the district court erred in dismissing Payne's claim for an award of attorneys' fees on the ground that he did not qualify as a "prevailing party" for fee-shifting purposes under the Individuals with Disabilities Education Act. Although we ordinarily review a district court's factual determination of whether a party "prevailed" for clear error, *Heeren v. City of Jamestown*, 39 F.3d 628, 631 (6th Cir.1994) (citing *Citizens Coalition for Block Grant Compliance, Inc. v. City of Euclid*, 717 F.2d 964, 967 (6th Cir.1983)), and any subsequent decision to award or deny attorneys' fees for an abuse of discretion, *Loudermill v. Cleveland Bd. of Educ.*, 844 F.2d 304, 308 (6th Cir.), *cert. denied*, 488 U.S. 941, 109 S.Ct. 363, 102 L.Ed.2d 353 (1988), we review a district court's grant of summary judgment *de novo. Sims v. Memphis Processors, Inc.*, 926 F.2d 524, 526 (6th Cir.1991). Summary judgment is appropriate when, after considering the evidence in the light most favorable to the non-moving party, no genuine issue of material fact remains in dispute and "the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■■■ To be considered a "prevailing party," a plaintiff "must be able to point to a resolution of [a] dispute which changes the legal relationship between itself and the defendant." *Texas State Teachers Ass'n*, 489 U.S. at 792–93, 109 S.Ct. at 1493 (stating also that the "touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties"); *Krichinsky*, 963 F.2d at 850. A plaintiff therefore

"must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement." *Farrar v. Hobby*, 506 U.S. 103, 111, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992) (citations omitted). In other words, "a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Id.* at 111–12, 113 S.Ct. at 573.

■■■ This circuit recognizes that it is "not necessary that a party actually receive some form of judicially ordered relief" to qualify as a "prevailing party." *Wooldridge v. Marlene Industries*, 898 F.2d 1169, 1173 (6th Cir.1990). It is possible that a lawsuit "produces voluntary action by the defendant that affords the plaintiff all or some of the relief he sought through a judgment—e.g., a monetary settlement or a change in conduct that redresses the plaintiff's grievances. When that occurs, the plaintiff is deemed to have prevailed despite the absence of a formal judgment in his favor." *Id.* at 1173–74 (quoting *Hewitt v. Helms*, 482 U.S. 755, 760–61, 107 S.Ct. 2672, 2676, 96 L.Ed.2d 654 (1987)). However, "there must be some actual benefit to the plaintiff either in terms of monetary damages, injunctive relief, or a voluntary change in a defendant's conduct." *Id.* at 1174.

■■■ Where no direct relief is obtained and a plaintiff is claiming he or she "prevailed" because the defendant made significant changes in its past practices, the plaintiff's lawsuit must have been the "catalyst" that caused the defendant to make the changes.[2] *Loudermill*, 844 F.2d at 312. A two-part test is used to determine "prevailing party" status under the "catalyst" test. The

---

2. At least one circuit has interpreted *Farrar* as having eliminated the "catalyst" test as a basis for establishing "prevailing party" status. *See S–1 and S–2 v. State Bd. of Educ.*, 21 F.3d 49, 51 (4th Cir.) (court sitting *en banc*), *cert. denied*, —— U.S. ——, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994) (expressly overruling the "catalyst" theory and stating that a plaintiff may only qualify as a "prevailing party" by virtue of "having obtained an enforceable judgment, consent decree, or settlement giving some of the legal relief sought"). *But see Beard v. Teska*, 31 F.3d 942, 951 (10th Cir.1994) (stating that the Tenth Circuit, like all other Circuits that have considered the issue or have continued to speak in "catalyst" terms post-*Farrar*, does not agree with the holding in *S–1 and S–2* ).

first determination is whether, "as a matter of fact, the plaintiff's lawsuit was a necessary and important factor in achieving the relief desired." *Heeren,* 39 F.3d at 631. If this first question is answered affirmatively, the second inquiry is "whether the relief obtained resulted from a gratuitous act on the defendant's part or whether defendant's actions were mandated by law." *Id.*

We turn now to an examination of whether Payne is able to cross the " 'statutory threshold' of prevailing party status," *Texas State Teachers Ass'n,* 489 U.S. at 789, 109 S.Ct. at 1492, to sustain a claim under the fee-shifting provision of the Individuals with Disabilities Education Act.

## IV.

■ Our first determination must be whether Payne is able to show the resolution of a dispute that changed the legal relationship between Cleveland City Schools and himself. *Texas State Teachers Ass'n,* 489 U.S. at 792, 109 S.Ct. at 1493–94; *Krichinsky,* 963 F.2d at 850. In an effort to establish the existence of a dispute and some relief flowing from his request for a due process hearing, Payne contends that he received substantial benefits as a direct result of the administrative due process action undertaken to secure services for him under the statute.[3] In particular, Payne points to the recommendation during the juvenile court proceeding on January 12, 1993, that he be placed in a wilderness program. Payne argues that the recommendation was an attempt by the school system to avoid its educational obligations to him, and constituted a dispute. Payne further contends that his request for a due process hearing led to a compromise individualized educational program that accomplished two beneficial objectives: it kept him from being sent to a wilderness program

and it kept him in the least restrictive environment possible.

The district court found that the wilderness program recommendation was made in a collateral state proceeding and it would be speculative to conclude that Cleveland City Schools thereby intended not to provide Payne with an appropriate individualized educational program. The district court further found that the school system never took a position contrary to that of Payne, and all indications were that Cleveland City Schools acknowledged its responsibility for Payne's education after his discharge from the Chattanooga facility. The record indicates that the multidisciplinary team meeting process was underway before Payne requested a due process hearing, and the school system appeared to be making every effort to fulfill its obligations to Payne under the Individuals with Disabilities Education Act. We agree with the district court's conclusion that Payne's arguments are not persuasive and that there was no underlying dispute between the parties at the time he requested a due process hearing.

Even if we were to hold that a dispute did exist, that alone would not suffice to confer "prevailing party" status on Payne. As we have stated, a plaintiff must also "obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement." *Farrar,* 506 U.S. at 111, 113 S.Ct. at 573 (citation omitted). Payne's due process request was dismissed by the administrative law judge without a hearing on the merits. There was neither an enforceable judgment against Cleveland City Schools nor a consent decree in Payne's favor. Furthermore, despite Payne's description of the compromise individualized educational program as a settlement, we do not believe it rises to the level of relief envisioned by *Farrar.* A "settlement is the compromise of a dispute. If the

---

3. Specifically, Payne claims Cleveland City Schools had been ignoring his rights for years and agreed to a compromise individualized educational program only after he threatened the school system with a due process hearing. Payne alleges that Cleveland City Schools had been denying him a "free and appropriate" education in that: the wilderness camp recommendation created a real and immediate threat of

detrimental change in his educational placement; one hour of homebound education per week was inappropriate and insufficient; Cleveland City Schools failed to place him in the least restrictive setting possible; the school system abdicated responsibility to the juvenile court; and the school system refused to pay for certain hospital evaluations.

board changed its mind for reasons unrelated to the legal proceeding ... the change is not aptly described as a settlement." *Brown,* 12 F.3d at 685. The compromise individualized educational program did not constitute a settlement, as Payne contends. Cleveland City Schools was required by law to see that an appropriate individualized educational program was in place, and nothing indicates that the school system would not have done so without the filing of a due process request. Not having obtained an enforceable judgment, a consent decree in his favor, or the settlement of a dispute, Payne does not qualify as a "prevailing party" under *Farrar.*

■ We next examine whether Payne's request for a due process hearing nevertheless served as the "catalyst" that caused Cleveland City Schools to change its policies or practices. To survive the first prong of the "catalyst" test, Payne must show a causal link between his request for the due process hearing and the allegedly beneficial outcome. *See Parents of Student W v. Puyallup School Dist.,* 31 F.3d 1489, 1498 (9th Cir.1994). We must therefore determine whether Payne's request for a due process hearing was "a necessary and important factor" in achieving the compromise individualized educational program. *See Heeren,* 39 F.3d at 631 (citing *City of Euclid,* 717 F.2d at 966).

This court has stated that chronological evidence is one factor that may be considered in determining whether a party's lawsuit had a catalytic effect with regard to an allegedly beneficial outcome. *City of Euclid,* 717 F.2d at 967. In *City of Euclid,* a citizens' coalition sued the Department of Housing and Urban Development and the City of Euclid, Ohio for alleged failures to comply with and ensure compliance of fair housing obligations. The suit was settled before a trial on the merits, and the coalition, claiming it had "prevailed" in achieving the settlement, filed a motion for attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A). The coalition argued that the sequence of events and the settlement agreement showed the catalytic effect of its efforts in compelling the Department of Housing and Urban Development to force the city's compliance with the housing obligations. This court, however, disagreed and stated:

> While chronological evidence is certainly a consideration in cases of this sort ... it is not conclusive. In this case, HUD's efforts to compel compliance through warnings and demands of assurances predate the Coalition's active involvement. The record strongly suggests HUD's predisposition to achieve compliance despite the Coalition's activities. That the Department may have moved more slowly than the Coalition would have wished is beside the point. Whether the lawsuit hastened the process is, at best, uncertain, and certainly not so obvious as to render the decision of the district court clearly erroneous.

*Id.*

In *Wheeler v. Towanda Area School Dist.,* 950 F.2d 128 (3d Cir.1991), the court likewise looked to chronological evidence in determining whether the parents of a deaf student "prevailed" in special education due process proceedings against the school district. While the parents did not succeed on any of their legal claims, they did obtain a new interpreter, which was some of the benefit they sought in bringing suit. Therefore, the court looked to whether the parents were able to show a causal connection between their lawsuit and the hiring of the new interpreter. The court held that the parents did not "prevail" over the school district because their legal claims were rejected and their "action was responsible for no cognizable measure of relief." *Id.* at 133. The court explained its position by stating:

> Neither the hearing officer nor the Secretary ordered the School District to do anything that they were not already doing.... In fact, the district was searching for a new interpreter and already consulting with an outside expert before the hearing officer's decision and months before the Secretary's final order .... the most that can be said is that the Parents have established a sequence of events. They have failed to establish an adequate record basis for anything more. We therefore conclude that the hearing officer's decision and the Secretary's order precipitated no change at all. Accordingly, because the School

District's behavior remained constant at all times towards the Parents, and because the Parents failed to submit contrary evidence to the district court, we find no reversible error. The Parents' action did not contribute materially to any benefit ultimately conferred upon [the daughter]. *Id.* at 132–33.

In this case, the district court found no substantive evidence that Payne's filing of the due process hearing request was a material contributing factor in bringing about a beneficial individualized educational program. The record supports the district court's finding that the school system was going forward with the legally mandated process prior to Payne's filing of the request. The process of holding multidisciplinary team meetings and developing an individualized educational program in accordance with the Individuals with Disabilities Education Act was begun before the due process request was made and ended without regard to that request. *See Salley v. St. Tammany Parish School Bd.*, 57 F.3d 458, 468 (5th Cir.1995) (denying "prevailing party" status where the plaintiff was well aware that a beneficial result might have been obtained at any time without regard to the existence of due process hearings).

Even where a defendant makes some changes following administrative proceedings that comport with a plaintiff's demands, if the actions are taken unilaterally by the defendant and there is no indication that they would not have transpired had the plaintiff not pursued the administrative process, the plaintiff cannot qualify as a "prevailing party" for fee-shifting purposes. *Combs v. School Bd. of Rockingham County*, 15 F.3d 357, 362 (4th Cir.1994). In *Combs*, the plaintiff argued that, even though he did not receive a favorable judgment from the administrative process, the pressure of the proceeding brought about relief in the form of a revised individualized educational program, and he deserved attorneys' fees as a "prevailing party" who instigated that relief. The court held, however, that there was no indication that the actions taken by the school board would not have been provided absent Combs' efforts, and stated that the school board was entitled to evaluate a situation carefully before embarking on "wholesale and often expensive changes." *Id.* at 363.

Finally, we distinguish this case from *Phelan v. Bell*, 8 F.3d 369 (6th Cir.1993). In *Phelan*, the mother of a severely handicapped child was concerned that the public school's programs were insufficient, and proposed the use of an electronic device to control her son's self-injurious behavior. The school system refused to authorize the device, and after a series of administrative hearings, Phelan succeeded in obtaining a determination that the device was a viable option for her son, and in bringing about a "definite change in [her son's] legal relationship with defendants." *Id.* at 374. In reaching its decision that Phelan "prevailed," the court relied on the fact that the "due process hearings were dynamic and interactive, not static," and found that because of the due process hearings, "defendants [were] required to implement a new [individualized educational program] with new approaches." *Id.* at 373–74.

While Payne's mother's tenacity and persistence in seeking an appropriate individualized educational program for her son are laudable, the district court did not err in finding her unable to make the required causal showing that the request for an administrative due process proceeding precipitated beneficial change that would not have taken place otherwise. *See Combs*, 15 F.3d at 363. Because Payne does not survive the first prong of the "catalyst" test, it is unnecessary to consider the second.

Payne is not a "prevailing party" for purposes of the attorneys' fees provision of the Individuals with Disabilities Education Act. The district court judgment is **AFFIRMED.**

RYAN, Circuit Judge, dissenting.

The majority opinion concludes that Daniel Payne is not a prevailing party. However, in my judgment, plaintiff raised genuine issues of material fact with regard to this issue; summary judgment should not have been granted. Accordingly, I respectfully dissent.

## I.

The majority omits many of the facts that support plaintiff's claim and concludes that no dispute existed because the school "never took a position contrary to that of Payne"; the school "acknowledged its responsibility for Payne's education"; and the school had embarked on the multidisciplinary team meeting process before Payne requested a due process hearing. Without a dispute, and a resolution of that dispute to the benefit of the plaintiff, the majority reasons, the plaintiff cannot be said to have "prevailed."

## II.

In deciding that there was no dispute between the parties, the majority places a great deal of weight on the fact that "the multidisciplinary team meeting process was under way before Payne [obtained counsel and] requested a due process hearing." However, there is no evidence in the record that this meeting was likely to result in a more beneficial program than had any of the numerous prior meetings in the years when Payne was not represented by an attorney. Although the majority opinion states that "the school system appeared to be making every effort to fulfill its [statutory] obligations to Payne," a reasonable jury might well conclude, based on evidence of the school's past conduct, that the school system had taken "a position contrary to Payne," that the school was only "going through the motions" before Payne requested a due process hearing. The majority ignores the abundant evidence that the defendant school dragged its feet for years and, contrary to law, provided entirely inadequate educational services to the plaintiff. It was not until the mother of the handicapped child finally obtained counsel, who conducted months of negotiations over the appropriate content of the IEP, that the school got serious about addressing Payne's handicap.

There is evidence in the record that Payne's educational problems in the defendant school system were reported by a teacher in February of 1986 but that evaluation of Payne did not begin until April of that year. Although the 1986 psychological evaluations of Payne indicated that his learning and behavioral problems were characteristic of emotional disturbance or a behavior disorder, the record does not indicate that the school performed any further testing in these areas, called for a multidisciplinary team meeting (M-team meeting), devised an individualized education plan (IEP) for Payne, otherwise took any action to address Payne's handicap and special needs, or even fulfilled its statutory obligation to inform Payne's parents of his statutory rights. Payne continued to exhibit serious behavioral problems at the school for the next several years and was eventually placed in a psychiatric unit from February through June of 1990. One of Payne's doctors recommended that a meeting—in which the doctor and a behavior management consultant should participate—be called immediately to discuss plaintiff's educational needs and to develop an appropriate IEP. The doctor identified plaintiff's specific learning problems and made suggestions for accommodating plaintiff's special needs. However, when the school finally held an M-team meeting and devised an IEP for plaintiff in August of 1990, the school apparently did not include in the planning process any of the professionals who had treated Payne during his hospital stay, nor did the school adopt any of the doctor's suggestions. In fact, neither this IEP nor subsequent IEPs provided specific accommodations for Payne's handicap; rather, the IEPs summarize Payne's (poor) academic and behavioral performance, note his delayed social skills, articulate developmental "goals" for Payne, but provide no significant *means* of assisting Payne in accomplishing these goals—no special services, outside consultations, or individualized programming of any significance at all. Although Payne's academic, behavioral, and social performance continued at an unacceptable level far below his evaluated potential, the school did not adjust its approach in order to enable the handicapped child to obtain any educational benefit from the school programs.

Short-term placements in psychiatric or disciplinary programs interrupted Payne's attendance in the defendant school. After one such placement, Payne's mother sought, in December of 1992, to reenroll him in the defendant school. The school denied plaintiff

any educational services for a month and then placed him, with his mother's agreement, on one hour of homebound educational services per week while the school discussed the impact of a juvenile judge's order barring Payne from the school. In late January 1993, Payne and his family, along with school officials, appeared in juvenile court. Without notifying Payne or his family beforehand, the school officials endorsed in court a recommendation that Payne never be placed in a normal school again but that he be sent to a wilderness camp. The judge adjourned the hearing and instructed the mother to obtain a lawyer, which she did in order to prevent her son's exclusion from the school and placement in a wilderness camp. The mother's lawyer mailed a request for a due process hearing to the defendant "to determine whether [plaintiff] is receiving a free and appropriate public education." The mother had Payne evaluated at the Menninger Clinic and then demanded implementation of the resulting recommendations. Months of negotiations then took place.

Because the parties appeared to be making progress toward an appropriate IEP, the mother agreed to postponing, and eventually dropping altogether, the due process hearing request. It is the mother's position that prior to the involvement of the attorneys, there was "nothing to indicate that a [M-team] meeting would result in anything different for [plaintiff] from past IEPs, but that the Defendant would attempt to place the M-team's stamp of approval on Defendant's demand that the judge send [Payne] away. For example, there were no professionals with sophisticated knowledge about plaintiff's problems" participating in the M-team meeting that was scheduled prior to the due process hearing request.

There were a number of points of contention between the parties and a number of obstacles were overcome before an appropriate IEP was agreed upon and the due process hearing request dismissed. It appears that the mother "insisted that any settlement must include critical elements of the Menninger Clinic staff's recommendations and must include defendant's agreement to use at least one Menninger staff person as a consul-

tant." Payne's mother also "insisted that the Defendant provide [Payne] with the services of a clinical psychologist bi-weekly." Payne's mother wanted, and the defendant opposed, an IEP that included requiring the defendant to keep, and review daily, behavioral records and to use in-service training from Wilson Anderson of the Menninger Clinic. At the early stage of negotiations, the defendant school still recommended that Payne go to Cumberland Hall Psychiatric Institute's day school program, to which Payne's mother objected. At the September 7, 1993, M-team meeting, Payne's attorney stated that the due process hearing would have to go forward if the defendant would offer no more than an isolated day program at Cumberland Hall Psychiatric Institute's school. According to Payne's mother, the defendant then produced another temporary IEP—one that incorporated some of the Menninger recommendations.

On September 30, 1993, Payne's mother reportedly agreed to another continuation of a due process hearing "on the condition that the Defendant agree to use a Menninger designed daily behavioral check list and incorporate them into [plaintiff's] IEP. The Defendant inserted goals incorporating these check lists." During October, Payne's mother and attorneys continued to "insist that the Defendant build into the program the ability to fine tune the program and make changes daily, depending upon [Payne's] response to the program." According to her affidavit, Payne's mother signed the final IEP only after the defendant agreed to hire a consultant to provide counseling to the handicapped child twice a week and to make appropriate changes in the IEP—in collaboration with Payne's parents—to accommodate Payne's actual response to the program. Under pressure from the mother and her attorneys, defendant designated an assistant special education supervisor to meet with Payne and review Payne's behavioral check list each day; agreed to consult with Wilson Anderson of the Menninger Clinic on a regular basis; agreed to pay for regular consultations between Payne, his family, and Mr. Anderson; and agreed to simplify and modify behavioral rules for Payne and allow Wilson Anderson to decide which behavior rules and punish-

ments should apply to Payne. The IEP also required review and revision within 90 days to make adjustments in the program. Finally, the parties agreed that if the program failed, a special day school, not a wilderness program, would be the fall-back option. Only after these agreements were made did plaintiff drop the demand for a due process hearing.

## III.

The majority apparently disagrees with this circuit's determination that IDEA allows attorney's fees for a parent or guardian who has "prevailed" at the administrative level; the opinion states that a "commonsensical" reading of the statute would indicate that a party whose administrative claim is resolved without an administrative or court determination of the merits cannot recover attorney's fees. The Act allows attorney fee awards for prevailing parties "[i]n any action *or proceeding* brought under this subsection." 20 U.S.C. § 1415(e)(4)(B) (emphasis added). This court has held that attorney's fees are available to plaintiffs who are successful at an administrative proceeding. *Eggers v. Bullitt County School Dist.*, 854 F.2d 892 (6th Cir.1988). *Eggers* established the rule in the Sixth Circuit and is binding; whether there is a "semantic strain" in the *Eggers* interpretation is unimportant at this point.

Thus, the law in this circuit is that attorney's fees are available to plaintiffs successful in an administrative proceeding even where no other litigation was necessary to enforce or challenge an administrative decision. *Eggers v. Bullitt County School Dist.*, 854 F.2d 892 (6th Cir.1988). Because the Sixth Circuit equates administrative proceedings with court actions, the analogous 42 U.S.C. § 1988 definition of prevailing party, *see Krichinsky v. Knox County Schools*, 963 F.2d 847, 849 (6th Cir.1992), should be imported to assess an IDEA plaintiff's success at the administrative hearing level even if the plaintiff does not proceed to the court litigation level. The most obvious parallel to an award of attorney fees in a civil rights action resolved by a consent decree or settlement beneficial to the plaintiff is an award of attorney fees in an IDEA dispute resolved by negotiating to an IEP beneficial to the plaintiff.

"Prevailing party" is generously defined because qualification for that status is a mere threshold issue and does not guarantee any significant award. As the majority states, to qualify as a prevailing party a plaintiff must "obtain an enforceable judgment against the defendant from whom fees are sought, *or comparable relief* through a consent decree or settlement." *Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (emphasis added). However, relief under IDEA was not at issue in *Farrar* and because "prevailing party" standards are imported from the civil rights litigation context into the IDEA context, the language of *Farrar* should be translated into the IDEA context. A final IEP, achieved after initiation but before resolution of an IDEA administrative hearing, is the equivalent of "comparable relief through a consent decree or settlement" achieved after initiation but before resolution of a civil rights court action. The plaintiff in this case established at least a genuine issue of material fact that the final IEP was beneficial and was a negotiated "settlement" of the parties' dispute.

The plaintiff also established a genuine issue of material fact that his mother's initiation of a due process hearing and use of attorneys was the catalyst for the improved IEP finally achieved. As the majority opinion states, the catalyst test dictates that a party has prevailed if, "as a matter of fact, the plaintiff's lawsuit was a necessary and important factor in achieving the relief desired," if the plaintiff's lawsuit "caused the defendant to act." The history of the tug-of-war between Payne and the school system, as set forth in affidavits, and the undisputed chronology of events establish a genuine issue of material fact as to the cause of the *form* or *quality* of the final IEP. I do not disagree with the majority that the process to write *an* IEP was underway prior to initiation of the due process hearing procedures; however, the *content* of the IEP was very much in dispute, and an IEP containing substantive provisions beneficial to the plaintiff that the defendants never proposed is what

the child's mother and her attorneys "won." The investigatory work and pressure brought to bear on the noncompliant school by the plaintiff's attorney should not go uncompensated. Congress provided for attorney fee awards in order to encourage plaintiffs to assert their right to a free and appropriate education and to encourage attorneys to represent these plaintiffs and thereby ensure enforcement of the statute.

If the lawsuit did cause the defendant to act, the second inquiry is whether the relief obtained resulted from a gratuitous act of the defendant or whether the defendant's actions were legally required. Again, although the majority does not reach this question, it is readily apparent that many or most of the concessions achieved by the plaintiff were required by law. Until this admirably tenacious mother sought legal assistance, the plaintiff was not receiving the "free and appropriate" education that the school system was required by law to provide to him.

### IV.

I would reverse the district court's judgment.